UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MONEYFORLAWSUITS V LP, d/b/a MFL
CASEFUNDING, a Delaware limited partnership,
and GUARDIAN ADVISORS LP II, d/b/a MFL
CASEFUNDING, a Delaware limited partnership,

        Plaintiffs,

        v.

TAMMY ROWE a/k/a TAMMY LACROSS,
CARRIE FLEMION, LURA L. GIPSON,
ROXANNE LOFTON, DELORES MADISON,
WENDY GARAGIOLA, PAMELA MOFFIT,
all Michigan residents, and VIVIAN AROUSELL,
an Indiana resident,

        Defendants.

_____/

CASE NO. 4:10-CV-11537
JUDGE MARK A. GOLDSMITH
MAGISTRATE JUDGE PAUL KOMIVES

**REPORT AND RECOMMENDATION ON THE PARTIES' CROSS-MOTIONS
FOR SUMMARY JUDGMENT (docket #188 and #190)**

I.      RECOMMENDATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
II.     REPORT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
     A.    *Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
     B.    *Choice of Forum* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
     C.    *Choice of Law* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
     D.    *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
          1.    *Summary Judgment Standard* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
          2.    *Analysis under New York Law* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
          3.    *Analysis under Michigan Law* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
     E.    *Conclusion* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
III.    NOTICE TO PARTIES REGARDING OBJECTIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

\*      \*      \*      \*      \*

I.      RECOMMENDATION: The Court should grant plaintiffs' motion for summary judgment

(docket #188) and deny defendants' motion for summary judgment (docket #190).

II.     REPORT:

A.    *Background*

This matter is before the Court on the parties' cross-motions for summary judgment, filed on July 1, 2011 (by plaintiffs) and July 8, 2011 (by defendants). Responses and replies to each of the motions have been filed. The basic facts are not in dispute.

Plaintiff Guardian Advisors LP II, a Delaware limited partnership which, along with plaintiff MoneyForLawsuits V LP, does business as MFL CaseFunding ("CaseFunding"), invests in claims and lawsuits by purchasing the right to receive a portion of any judgment or settlement. Between February and May 2009, CaseFunding entered into "Contingent Purchase Agreements" with defendants Wendy Garagiola, Pamela Moffitt, Lura Gipson, Delores Madison, Roxanne Lofton, and Vivian Arousell, who at the time were members of a plaintiff class in a suit against the Michigan Department of Corrections. In each case, CaseFunding provided funds to the defendant individual or to an entity to whom the defendant owed money, as well as an origination fee to a third party broker and processing fee to other entities, as reflected in the following table:

| | Garagiola | Moffitt | Gipson | Lofton | Madison | Arousell |
|---|---|---|---|---|---|---|
| Direct funds | $50,000.00 | $50,000.00 | $75,000.00 | $50,000.00 | $30,000.00 | $30,000.00 |
| 3d party | 46,852.00 | 35,197.00 | 29,573.00 | --- | 60,300.00 | 35,371.00 |
| Orig. fee | 14,827.80 | 13,079.55 | 18,823.14 | 7,500.00 | 16,200.00 | 9,880.65 |
| Proc. fee | 2,000.00 | 2,000.00 | 2,500.00 | 500.00 | 500.00 | 500.00 |
| Total | $113,679.80 | $100,276.55 | $125,896.14 | $58,000.00 | $107,000.00 | $75,751.65 |

*See* Br. in Supp. of Def.s' Mot. for Summ. J., Exs. A-D, F, H. In each case, the processing fee was paid to Quick Cash, Inc. The origination fee was paid to Trimark Capital Funding, Inc. (defendants Garagiola, Moffitt, and Gipson), Case Trace, Inc. (defendants Lofton and Madison), or Montclair Funding Group (defendant Arousell). The third party funds were distributed to pay existing liens to Bridge Funds, LLC (defendants Garagiola, Moffitt, Gipson, Lofton, and Arousell), or Peachtree

Pre-Settlement Finance (defendant Madison).[1]  In June 2009, CaseFunding and defendants Lofton and Madison entered into second agreements, advancing an additional $18,250.00 to Lofton or on her behalf, and an additional $35,000.00 to Madison or on her behalf.  Each of these agreements incorporated by reference the prior agreements made with these defendants.  Thus, pursuant to the second agreements, defendant Lofton's total was $76,250.00, and defendant Madison's total was $142,500.00.  *See id.*, Ex. E & G.

The agreements in each case provided for repayment of a set amount if CaseFunding's share of the proceeds was paid on a certain date, increasing at a compounded monthly rate, as set forth in the following table:

|  | Initial Payment Date | Initial Payment Amount | Monthly Rate | Annualized Rate |
|---|---|---|---|---|
| Garagiola | 4/1/09 | $150,660.01 | 4.25% | 64.78% |
| Moffitt | 4/1/09 | 132,896.66 | 4.25% | 64.78% |
| Gipson | 4/1/09 | 165,237.78 | 4.25% | 64.78% |
| Lofton | 4/1/09 | 72,617.82 | 3.5% | 51.11% |
|  | 7/1/09 | 25,203.34 | 4.99% | 79.38% |
| Madison | 4/1/09 | 140,435.28 | 4.25% | 64.78% |
|  | 7/1/09 | 49,035.39 | 4.99% | 79.38% |
| Arousell | 7/1/09 | 100,254.59 | 4.25% | 64.78% |

*See id.*, Exs. A-H.

In each case, the defendant signed a "Contingent Proceeds Purchase Agreement Consumer Disclosure Statement" setting forth an explanation of the basic terms of the agreement, including

---

[1]The Court has entered a default judgment against defendant Tammy Rowe.  Although it appears that defendant Carrie Flemion has been served with the summons and complaint, she has not appeared in this action *pro se* or through counsel, and has not answered the complaint.  The parties' motions do not address plaintiffs' claims against defendant Flemion.

the purchase price, fees, and monthly rate. *See id.*, Ex. A.[2] The disclosure statement also states that "[t]he Agreement evidences a purchase and sale of a portion of the Proceeds from the Claim. It does not represent a loan to you." *Id.* The Agreement itself provides that, in exchange for the purchase price paid to the defendants by CaseFunding, the seller "unconditionally and irrevocably grants, assigns, transfers and conveys a portion of the Proceeds recovered with respect to the Claim in accordance with" the terms of the agreement. The Agreement continues:

> Purchaser's Share shall be paid to Purchaser in full on the date the Proceeds are received. Purchaser's share shall be withheld from any money collected as a result of the Claim and paid to Purchaser immediately upon collection without set-off or reduction of any kind. The amount due shall be paid immediately upon collection without set-off or reduction of any kind. The amount due shall be paid immediately after attorney fees (including the expenses charged by the Seller's attorney for costs) and after payment to any recorded lien holder that might exist prior to the date hereof, or which may have priority by law. Seller will not receive any money from the Proceeds of the Claim until Purchaser has been paid in full.

> In the event the Proceeds are received in multiple payments, whether pursuant to a structured settlement, annuity, or other form of installment payment or incremental recovery, Purchaser's right to receive full payment of its Share from such Proceeds shall be prior and senior to the Seller's rights to receive any portion of the Proceeds.

> If the Proceeds are insufficient to pay Purchaser's Share, then Purchaser's share will be limited to the proceeds from the Claim.

> If the Seller does not recover any money from the Claim, then the Seller shall owe nothing to Purchaser.

*Id.*, Contingent Proceeds Purchase Agreement, at 2, ¶ 3. The Agreement further provides that "this Agreement constitutes a non-recourse sale of contingent proceeds and is not a loan," and that "Purchaser shall not have any right to control, interfere with, or influence the handling of the Claim

---

[2]Apart from the specific purchase price and monthly rate terms, the agreements are identical. For simplicity, I cite to only the purchase agreement with defendant Garagiola for purposes of discussing the general terms of the contract. Hereinafter, when referring to the general, universal terms of the Agreements, I will simply cite the provision as "Agreement, ¶ x."

or any settlement negotiations that may occur. The Purchaser's only right shall be to be paid its Share of the Proceeds of the Claim pursuant to this Agreement." *Id*. at 3, ¶ 6. The Agreement requires the seller to, *inter alia*, "notify Purchaser of any verdict, award, settlement, discontinuance or ending with respect to the Claim and to cause the Attorney to do the same." *Id*. at 4, ¶ 11. The Agreement provides that:

> 24.    Seller has been advised and understands that the cost of selling a portion of the Proceeds to Purchaser is potentially expensive and should only be used as a last resort and that Purchaser may make a substantial profit from its investment by the terms of this Agreement. Other sources of funding, including loans, may be available at more favorable rates, payment schedules, terms and conditions.
>
> 25.    Seller has had a full and complete opportunity to consult with an attorney and other advisors before signing this Agreement. This Agreement has been fully explained to Seller, and all questions that Seller might have about this transaction have been fully explained. . . .

*Id*. at 7, ¶¶ 24-25. The Agreement provides a five business day period in which the seller may rescind the Agreement. *See id*., ¶ 26. Each Agreement is accompanied by an Attorney Acknowledgment, in which counsel for defendant affirms, under penalty of perjury, that he has "reviewed and explained the contract to Seller, including the annualized rate and the monthly rate, compounded monthly, applied to calculate the Purchaser's Share of the Proceeds with respect to the Claim." *See id*., Attorney Acknowledgment.[3]

In each case, the funding was premised on the defendants' claims for damages as plaintiffs in *Neal, et al. v. Michigan Department of Corrections, et al.*, a case brought in the Washtenaw Circuit Court alleging that female inmates had been subjected to sexual harassment in violation of

---

[3]The Attorney Acknowledgment accompanying the agreement signed by defendant Arousell is more detailed than those accompanying the other agreements. Further, although signed by counsel, the acknowledgment contains a handwritten notation that counsel had "advised client not to enter into this agreement." *See id*., Ex. H, Attorney Acknowledgment.

the Michigan Elliot-Larsen Civil Rights Act.  At the time the agreements at issue in this case were executed, the jury had returned separate verdicts for each of the class members.  After the agreements had been executed and while the matter was pending on appeal, the parties to the state court action reached a settlement totaling $100,000,000.00.  The settlement was approved by the Washtenaw County Circuit Court on August 21, 2009.  Pursuant to the settlement, each defendant was given a settlement amount to be paid in installments of 10% in each of October 2009 and 2010, 15% in October 2011, 20% in each of October 2012 and 2013, and 25% in October 2014.  *See* Br. in Supp. of Def.s' Mot., Exs. J & K.  The following table reflects the amounts of the defendants' initial jury verdict and settlement:

|  | Verdict | Settlement |
|---|---|---|
| Garagiola | $850,000.00 | $552,500.00 |
| Moffitt | 475,000.00 | 308,000.00 |
| Gipson | 550,000.00 | 357,500.00 |
| Lofton | 335,000.00 | 224,450.00 |
| Madison | 885,000.00 | 592,950.00 |
| Arousell | 2,400,000.00 | 1,560,000.00 |

On January 15, 2009, after the jury verdict had been returned but prior to the execution of any of the agreements, Kenneth W. Bradt, CEO of CaseFunding/Attorney Financial Services, sent a letter via e-mail to Deborah LaBelle, lead counsel for the plaintiffs in the *Neal* action, discussing various aspects of the Agreements.  Among other matters discussed, the letter stated:

> Finally, this will also confirm that, based upon our conversation, even though there are judgments in these cases, those judgments are on appeal and the appellate courts may overturn the judgments, reduce the awards, or refer the cases back to the trial court.  Therefore, you have indicated that there is no absolute recovery guaranteed in these cases.

6

*Id.*, Ex. N.  Ms. LaBelle responded in an e-mail on February 7, 2009:

> I don't disagree with your analysis and as you know we wish the clients could simply wait for the outcome of the case.  This will also confirm my agreement that your email of January 15th accurately represents our discussions and understanding.

*Id.*  On July 6, 2009, after execution of the Agreements, Ms. LaBelle sent a letter to members of the *Neal* plaintiff class advising them of the proposed settlement and recommending that the members accept the settlement.  In advising the class members to accept the settlement, Ms. LaBelle indicated:

> With regard to the first group of women who went to trial last year [which included all of the defendants in this case], there continues to be a substantial risk of loss.  The Department has appealed your awards to the Michigan Supreme Court.  The Department is urging the Michigan Supreme Court to rule that women prisoners do not have the right to sue under the Civil [R]ights Act, among other arguments for reversal of the jury verdicts.  If the Supreme Court accepts the case, it could dismiss the case and the verdicts will be lost in their entirety or it could reverse and order a new trial.  The Court could also decide not to take the case at this time and it could affirm the decision of the Court of Appeals and the trial Court.  The decision of the Supreme Court will be final and binding on all parties.  In our opinion, the risk of losing everything justifies compromising the awards to guarantee a substantial amount for the first trial groups' injuries and damages.

*Id.*, Ex. O.  The letter further advised that "[w]ith regard to the class members and class representatives, the settlement provides for guaranteed monetary awards for all without the risk of trials and appeals, which could take another ten years to resolve."  *Id.*

Plaintiffs allege that defendants failed to notify them of the settlement, and have failed to pay anything towards the amounts owed pursuant to the agreements.  Defendants' Answers to the Complaint, as well as their responses to plaintiffs' interrogatories, make clear that as of the time of the pending motions each defendant had received her 2009 and 2010 payments under the settlement, but had not paid anything to CaseFunding.  The Answers and discovery responses also make clear that defendants do not intend on paying any of the proceeds from the settlement to CaseFunding

7

because, in their view, the Agreements are usurious and therefore unenforceable under Michigan law. Plaintiffs' complaint asserts state law causes of action for breach of contract, anticipatory breach of contract, statutory conversion, and unjust enrichment.

The matter is currently before the Court on the parties' cross-motions for summary judgment. As aptly stated by plaintiffs, there are no genuine issues of fact present, there is no dispute concerning the terms of the Agreements, and there is no dispute that defendants have breached the Agreements by failing to pay to CaseFunding its share of the proceeds from the settlement. Rather, "[t]he only disputed issue in this case is whether the Contingent Purchase Agreements are enforceable contracts." Br. in Supp. of Def.s' Mot. for Summ. J., at 1. Plaintiffs argue that the usury issue is governed by New York law pursuant to the choice of law provision in the Agreements. Under New York law, plaintiffs argue, the Agreements are not loans subject to the usury laws, and therefore the Agreements are valid and enforceable. Plaintiffs also argue that the same result obtains if Michigan law is applied. Defendants, on the other hand, contend that Michigan law should apply, and that under Michigan law the Agreements charge a usurious interest rate and thus are unenforceable. Defendants also argue that, even under New York law, the second agreements to defendants Lofton and Madison are unenforceable. For the reasons that follow, the Court should grant plaintiff's motion for summary judgment and deny defendants' motion for summary judgment.[4]

B.    *Choice of Forum*

---

[4]The parties' arguments, focusing on whether the Agreements are enforceable, address only plaintiffs' breach of contract and anticipatory breach of contract claims. As noted above, plaintiffs' complaint also raises claims of statutory conversion and unjust enrichment. Whether, and to what extent, these claims remain is best considered after the Court has ruled on the parties' pending summary judgment motions.

Before addressing the parties' respective motions, the Court must first consider whether plaintiff has properly brought its claims in this Court.  In addition to a choice-of-law provision, the Agreements contain a choice-of-forum provision, which states:

> The Seller and Purchaser hereby irrevocably and unconditionally consent to submit to the exclusive jurisdiction of the courts of the State of New York in the County of New York for any lawsuits, claims or other proceedings arising out of or relating to this Agreement and agree not to commence any such lawsuit, claim or other proceeding except in such courts.  The Seller and Purchaser hereby irrevocably and unconditionally waive any objection to the laying of venue of any lawsuit, claim, or other proceeding arising out of or relating to this Agreement in the courts of the State of New York in the County of New York, and hereby further irrevocably and unconditionally waive and agree not to plead or claim in any such court that any such lawsuit, claim or other proceeding brought in any such court has been brought in an inconvenient forum.

Agreement, ¶ 22.   Notwithstanding this forum selection clause, the Court should exercise jurisdiction over this case.

"A forum selection clause does not oust a court of subject matter jurisdiction." *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 12 (1972), *overruled on other grounds by Lines v. Chasser*, 490 U.S. 495 (1989).  As with other matters that do not affect a federal district court's subject matter jurisdiction, "a party may obviously waive a forum selection clause."  *PC Specialists, Inc. v. Micros Systems, Inc.*, No. 10-CV-78, 2011 WL 3475369, at *3 (S.D. Cal. Aug. 09, 2011) (citing *Salton, Inc. v. Philips Domestic Appliances & Pers. Care B. V.*, 391 F.3d 871, 881 (7th Cir. 2004)); *see also*, *Heartland Payment Sys., Inc. v. Island Pride Homes, Inc.*, No. 10-cv-1739, 2011 WL 4458988, at *3 (E.D.N.Y. Aug. 31, 2011) (citing *American Int'l Group Europe S.A. (Italy) v. Franco Vago Int'l, Inc.*, 756 F. Supp. 2d 369, 378-79 (S.D.N.Y. 2010)) ("The applicability of a forum selection clause is not a jurisdictional matter and a party may waive its right to enforce such clause.").  Although a federal district court is not prohibited from doing so, because a forum selection clause is subject to

waiver and because a federal court should not generally refuse to exercise its jurisdiction once properly invoked, *Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 404 (1821), "[d]istrict courts should not, as a matter of general practice, dismiss *sua sponte* either for improper venue or for failure to follow a forum selection clause." *Automobile Mechanics Local 701 Welfare and Pension Funds v. Vanguard Car*, 502 F.3d 740, 746 (7th Cir. 2007).

Here the parties, by their conduct, have waived enforcement of the forum selection clause. Plaintiff has done so by filing its suit in this case. *See Heartland Payment Sys.*, 2011 WL 4458988, at *3. Defendants have done so by failing to raise the issue in their Answers to the Complaint or in a motion to dismiss or transfer the case on the basis of the forum selection clause. Indeed, defendants note the existence of the forum selection clause in their motion for summary judgment, but do not argue that the case should be dismissed or transferred on this basis. Because plaintiff has chosen Michigan as its preferred forum, defendants have not sought to enforce the forum selection clause, and all but one of the defendants are residents of Michigan making this Court the most convenient forum for the parties, the Court should not *sua sponte* dismiss or transfer the action based on the forum selection clause. *See Wesco Distribution, Inc. v. Anshelewitz*, No. 06 Civ. 13444, 2008 WL 2775005, at *4 (S.D.N.Y. July 16, 2008).

C.   *Choice of Law*

This Court has subject matter jurisdiction over plaintiffs' state law claims based on the diverse citizenship of the parties. *See* 28 U.S.C. § 1332. In resolving the parties' state law claims, the Court must apply the substantive law of the state. 28 U.S.C. § 1652 ("The laws of the several states . . . shall be regarded as rules of decisions in civil actions in the courts of the United States, in cases where they apply."); *see also, Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938). In the

absence of controlling authority by the controlling state's highest court on a particular issue, this Court must determine what that court would decide if faced with the issue. In making this determination, the Court may look to "the considered dicta" of the highest state court, *see Nolan v. Transocean Air Lines*, 365 U.S. 293, 293-96 (1961); decisions of that court in analogous cases, *see Monette v. AM-7-7 Baking Co.*, 929 F.2d 276, 280-83 (6th Cir. 1991); decisions of the state's intermediate appellate courts, *see West v. American Tel. & Tel. Co.*, 311 U.S. 223, 237 (1940); the majority view of other jurisdictions, *see Cox v. Nasche*, 70 F.3d 1030, 1031-32 (9th Cir. 1995); and scholarly treatises, law review articles, and Restatements of the law, *see Cox*, 70 F.3d at 1031. In determining the appropriate source of the substantive law governing the parties' claims, the Court applies the choice of law rules of Michigan, the state in which this Court sits. *See Klaxon v. Stentor Elec. Mfg. Co., Inc.*, 313 U.S. 487, 496 (1941) ("The conflict of laws rules to be applied by the federal court in Delaware must conform to those prevailing in Delaware's state courts."); *International Ins. Co. v. Stonewall Ins. Co.*, 86 F.3d 601, 604 (6th Cir. 1996) ("A federal court exercising diversity jurisdiction must apply the choice of law rules of the forum state."); *Security Ins. Co. v. Kevin Tucker & Assocs., Inc.*, 64 F.3d 1001, 1005 (6th Cir. 1995) (same).

In determining the validity of a contractual choice-of-law provision, Michigan follows the approach of § 187 of the *Restatement (Second) of Conflicts of Laws*. *See Chrysler Corp. v. Skyline Indus. Servs., Inc.*, 448 Mich. 113, 126, 528 N.W.2d 698, 703-04 (1995). Under this approach, a court will generally enforce the parties' choice of law unless either (1) the chosen state has no relationship to the parties and there is no basis for choosing that state's law, or (2) application of the chosen law would be contrary to the public policy of a state with a materially greater interest in determining the issue. *See id.*; RESTATEMENT (SECOND) OF CONFLICTS OF LAWS, § 187(a)(2)

11

Nevertheless, Michigan courts generally enforce contractual choice-of-law provisions; indeed, the Michigan courts have observed that "[i]t is undisputed that Michigan's public policy favors the enforcement of contractual forum-selection clauses and choice-of-law provisions." *Turcheck v. Amerifund Financial, Inc.*, 272 Mich. App. 341, 345, 725 N.W.2d 684, 688 (2006); *accord Robert A. Hansen Family Trust v. FGH Industries, LLC*, 279 Mich. App. 468, 476, 760 N.W.2d 526, 532 (2008). The public policy exception is a narrow one. As another Judge of this Court has observed, "both Michigan choice-of-law rules and general equitable choice-of-law policies support enforcing parties' agreed-upon choice-of-law clauses absent any strong public policy concerns to the contrary.'" *Prestige Capital Corp. v. Michigan Gage and Mfg., LLC*, 722 F. Supp. 2d 837, 843 (E.D. Mich. 2010) (Lawson, J.) (internal quotation omitted) (citing *In re Dow Corning Corp.*, 419 F.3d 543 (6th Cir. 2005)).

Defendants argue that the Agreements would be usurious under Michigan law because Michigan usury law is not confined to agreements which are loans, but extends to all agreements that charge a rate of interest. New York usury law, on the contrary, applies only to "loans," and defendants appear to concede that all but the second Agreements executed by defendants Lofton and Madison are outside the scope of the New York usury statute. Defendants argue, therefore, that application of New York law would contradict Michigan's public policy of protecting its residents from usurious contractual interest rates. It is not clear, however, that the Michigan courts would view the application of New York's slightly different usury statute as contrary to the public policy embodied in the Michigan usury statute.[5] Defendants have cited, and I have found, no Michigan

---

[5]As the Sixth Circuit has explained in applying Michigan choice-of-law rules as reflected in § 187, "[t]he fact . . . that a different result might be achieved if the law of the chosen forum is applied does not suffice to show that the foreign law is repugnant to a fundamental policy of the forum state. If the situation were otherwise, and foreign law could automatically be ignored whenever it differed from the

decisions addressing this issue.  However, courts in other jurisdictions that follow the rule of § 187 generally enforce a contractual choice of law provision even as to contracts that would be usurious under the forum state's law.  *See, e.g.*, *Sarlot-Kantarjian*, 599 F.2d 915, 917-18 (9th Cir. 1979) (California law); *Kronovet v. Lipchin*, 415 A.2d 1096, 1104-07 & n.16 (Md. Ct. App. 1980) (citing cases); *Sheer Asset Mgmt. Parnters v. Lauro Thin Films, Inc.*, 731 A.2d 708, 710 (R.I. 1999).[6] These decisions apply the "generally accepted" rule, reflected in § 187, "that the parties to a contract may agree as to the law which will govern their transaction, even as to issues going to the validity of the contract."  *Kronovet*, 415 A.2d at 1104.  Further, the *Restatement* embodies a preference for upholding the validity of a contract in making choice-of-law determinations.  *See, e.g.*, RESTATEMENT (SECOND) OF CONFLICTS OF LAWS, § 187, cmt. e (where parties have chosen a law that would declare the contract invalid, the chosen law will not be applied because the parties can be assumed to have intended the provisions of the contract to be binding); § 203 (in the absence of a choice of law provision, "[t]he validity of a contract will be sustained against the charge of usury if it provides for a rate of interest that is permissible in a state to which the contract has a substantial relationship and is not greatly in excess of the rate permitted by the general usury law of the state of the otherwise applicable law under the rule of § 188).

Further, it is doubtful that the Michigan courts would view its usury statute as reflecting such a fundamental public policy that it would override what the Michigan courts have explicitly

---

law of the forum state, then the entire body of law relating to conflicts would be rendered meaningless." *Johnson v. Ventra Group, Inc.*, 191 F.3d 732, 740 (6th Cir. 1999) (citation omitted).

[6]Where Michigan has adopted a rule reflected in a *Restatement* and there are no Michigan cases on point, the Michigan courts find persuasive "the manner in which other courts have applied the *Restatement*."  *Pierson Sand and Gravel, Inc. v. Keeler Brass Co.*, 460 Mich. 372, 385, 596 N.W.2d 153, 159 (1999).

recognized as a strong "public policy favor[ing] the enforcement of contractual forum-selection clauses and choice-of-law provisions." *Turcheck*, 272 Mich. App. at 345, 725 N.W.2d at 688. Importantly, under Michigan law a contract that provides for a usurious rate of interest is not void. *See Heide v. Hunter Hamilton Ltd. Partnership*, 826 F. Supp. 224, 229 (E.D. Mich. 1993) (Feikens, J.); *Bebee v. Grettenberger*, 82 Mich. App. 416, 423, 266 N.W.2d 829, 832 (1978). Rather, usury may be asserted only as a defense by the borrower in an action brought by the lender to enforce the debt, and then only to the extent of prohibiting the lender from recovering interest; the borrower remains liable to pay the principal. *See Lincoln Nat'l Bank v. Kaufman*, 406 F. Supp. 448, 451 (E.D. Mich. 1976) (Kennedy, J.); *Osinski v. Yowell*, 135 Mich. App. 279, 287-88, 354 N.W.2d 318, 322 (1984); Mich. Comp. Laws § 438.32. In lights of these facets of Michigan usury law, the public policy favoring enforcement of contractual choice of law provisions, and other jurisdictions' application of § 187, it cannot be said that application of New York usury law would violate a fundamental public policy of Michigan so as to justify upsetting the law chosen by the parties to govern their transactions.[7]

Further, even if application of New York usury law would violate Michigan public policy, this by itself would be insufficient to reject the parties' choice of law. The public policy exception applies only where the chosen law is contrary to a fundamental policy "of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of [§] 188, would be the state of the applicable law in the absence of an

---

[7]Indeed, in many respects New York law is more protective of borrowers than Michigan law. Under New York law, the rate of interest is capped at 6%, rather than at 7% as under Michigan law. *See* N.Y. Gen. Oblig. Law § 5-501. Further, unlike Michigan law, under New York law "[a] usurious contract is void and relieves the borrower of the obligation to repay principal and interest thereon." *Venables v. Sagona*, 925 N.Y.S.2d 578, 580 (N.Y. App. Div. 2011).

effective choice of law by the parties." RESTATEMENT (SECOND) OF CONFLICTS OF LAWS, § 187(2)(b). In other words, the conflict between Michigan and New York public policy is relevant only if both (a) Michigan has a materially greater interest than New York in determining the usury issue, and (b) Michigan law would apply under § 188 in the absence of the parties' choice of law provision. *See Kelly Servs., Inc. v. Marzullo*, 591 F. Supp. 2d 924, 938 (E.D. Mich. 2008) (Rosen, J.). Here, neither condition is met.

First, Michigan does not have a "materially greater interest" in the issue than New York. While Michigan undoubtedly has an interest in protecting its residents from usurious interest rates on loans, it is equally true that New York has an equally strong interest in protecting entities doing business in that state, and in allowing those entities to enter into and enforce contracts which are permitted by New York law. *See Adler v. Dell, Inc.*, No. 08-CV-13170, at *5 (E.D. Mich. Dec. 18, 2008) (Steeh, J.) (citing *Gay v. Credit Inform*, 511 F.3d 369, 390 (3d Cir. 2007)). Second, under § 188 it would be New York, rather than Michigan, law that applies. Section 188, which Michigan follows, *see Chrysler Corp.*, 448 Mich. at 126-28, 528 N.W.2d at 704-05, provides:

> (1) The rights and duties of the parties with respect to an issue in contract are to be determined by the local law of the state which, with respect to that issue, has the most significant relationship to the transaction and to the parties under the principles stated in § 6.
> (2) In the absence of an effective choice of law by the parties (see § 187), the contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:
> (a) the place of contracting;
> (b) the place of negotiation of the contract;
> (c) the place of performance;
> (d) the location of the subject matter of the contract; and
> (e) the domicile, residence, nationality, place of incorporation, and the place of business of the parties.
> These contacts are to be evaluated according to their relative importance with respect to the particular issue.

15

RESTATEMENT (SECOND) OF CONFLICTS OF LAWS § 188.  Here, these factors support application of New York law.  Defendants are Michigan (or, in one case, Indiana) residents, but CaseFunding has its principle place of business in New York, and thus this factor is neutral.  Likewise, it appears that the contracts were negotiated both in Michigan and New York, and the subject matter of the contract covers both states (the funds advanced by CaseFunding from New York, to be paid from the proceeds of a suit in Michigan), and thus these factors are likewise neutral.  However, the other factors support the application of New York law.  The contracts were consummated in New York, the funds were advanced from that state, and payment was to be made to CaseFunding in New York in the event defendants succeeded in their state court suit.  CaseFunding's injury occurred in New York.  Further, the general factors for resolving conflicts set forth in § 6, which are incorporated in § 188, also support the application of New York law.  These factors include not only the relevant interests of the respective states, but also "the needs of the interstate and international systems," "the protection of justified expectations," and "certainty, predictability, and uniformity of result," *See id.*, § 6(2)(a), (d), (f).  These factors are best served by allowing for the application of a uniform law, pursuant to the parties contracted expectations, of an entity doing business throughout the United States.  In short, "[i]n view of the balance of the § 188 factors . . . , the scales tip east–to the law of" New York.  *Professional Consultation Servs. Inc. v. Schaefer & Strohminger Inc.*, 412 Fed. Appx. 822, 825 (6th Cir. 2011); *see Johnson*, 191 F.3d at 741 ("Although Michigan has substantial ties to the instant transaction because it is Johnson's place of residence and the place where a major part of the performance occurred, Ontario has the more significant relationship because Manutec as well as the present defendant are Ontario corporations, the contract was negotiated and signed in Ontario, and the alleged breach occurred in Ontario.").

16

For the reasons set forth above, the Court should conclude that the public policy exception set forth in § 187(2)(b) is inapplicable, and thus that the contractual choice of law provision agreed to by the parties controls here. Further, even if the contractual choice of law provision were inapplicable, the appropriate law governing this dispute would be New York law in accordance with § 188. Accordingly, the Court should apply New York law.

D.    *Analysis*

1.    *Summary Judgment Standard*

Under Rule 56, summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "An issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Hedrick v. Western Reserve Care Sys.*, 355 F.3d 444, 451 (6th Cir. 2004) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "A fact is material only if its resolution will affect the outcome of the lawsuit." *Hedrick*, 355 F.3d at 451-52 (citing *Anderson*, 477 U.S. at 248). In deciding a motion for summary judgment, the Court must view the evidence in a light most favorable to the non-movant as well as draw all reasonable inferences in the non-movant's favor. *See Sutherland v. Michigan Dep't of Treasury*, 344 F.3d 603, 613 (6th Cir. 2003); *Rodgers v. Banks*, 344 F.3d 587, 595 (6th Cir. 2003).

"The moving party has the initial burden of showing the absence of a genuine issue of material fact as to an essential element of the non-moving party's case." *Hedrick*, 355 F.3d at 451 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). To meet this burden, the moving party need not produce evidence showing the absence of a genuine issue of material fact. Rather, "the burden on the moving party may be discharged by 'showing' -- that is, pointing out to the district

court -- that there is an absence of evidence to support the non-moving party's case." *Celotex Corp.*, 477 U.S. at 325; *see also*, FED. R. CIV. P. 56(c)(1) (moving party may meet its burden by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."). "Once the moving party satisfies its burden, 'the burden shifts to the nonmoving party to set forth specific facts showing a triable issue.'" *Wrench LLC v. Taco Bell Corp.*, 256 F.3d 446, 453 (6th Cir. 2001) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)); *see also*, FED. R. CIV. P. 56(e).  To create a genuine issue of material fact, however, the non-movant must do more than present some evidence on a disputed issue.  As the Supreme Court has explained:

> There is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.  If the [non-movant's] evidence is merely colorable, or is not significantly probative, summary judgment may be granted.

*Anderson*, 477 U.S. at 249-50. (citations omitted); *see Celotex Corp.*, 477 U.S. at 322-23; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).  Thus, "[t]he existence of a mere scintilla of evidence in support of the non-moving party's position will not be sufficient; there must be evidence on which the jury could reasonably find for the non-moving party." *Sutherland*, 344 F.3d at 613.

  2.  *Analysis under New York Law*

  Here, there is no dispute that defendants have breached the contracts by not paying the amounts due thereunder after they recovered proceeds from the state court litigation settlement.  Nor are there any material facts in dispute.  The only question before the Court is the legal question of whether the contracts, or any part thereof, or void as usurious.  Applying New York law, the Court

18

should conclude that the contracts are not usurious, and thus that plaintiffs are entitled to summary judgment.

The New York usury statute provides, in relevant part, that "[t]he rate of interest, as computed pursuant to this title, upon the loan or forbearance of any money, goods, or things in action, . . . shall be six per centum per annum unless a different rate is prescribed in section fourteen-a of the banking law."  N.Y. GEN. OBLIG. LAW § 5-501.  Under this statute, "[i]t is well settled that there can be no usury in the absence of a loan or forbearance of money."  *Transmedia Restaurant Co., Inc. v. 33 E. 61st Street Restaurant Corp.*, 710 N.Y.S.2d 756, 760 (N.Y. Sup. Ct. 2000) (citing *Donatelli v. Siskind*, 565 N.Y.S.2d 224, 226 (N.Y. App. Div. 1991)); *see also*, *Seidel v. 18 E. 17 St. Owners*, 598 N.E.2d 7, 11-12 (N.Y. 1992) (citations and quotations omitted) ("Usury laws apply only to loans or forbearances, not investments. If the transaction is not a loan, there can be no usury, however unconscionable the contract may be.").  The hallmark of a loan, for purposes of the usury statute, is an absolute right to repayment or some form of security for the debt.  "'For a true loan it is essential to provide for repayment absolutely and at all events or that the principal in some way be secured as distinguished from being put in hazard.'"  *Zoo Holdings, LLC v. Clinton*, No. 107415/04, 2006 WL 297730, at *4 (N.Y. Sup. Ct. Jan. 24, 2006) (quoting *Rubenstein v. Small*, 75 N.Y.S.2d 483, 485 (N.Y. App. Div. 1947)).  In other words, "there can be no usury unless the principal sum advanced is repayable absolutely."  *Transmedia Restaurant*, 710 N.Y.S.2d at 760. Under New York law, there is a strong presumption against finding a transaction to be usurious, and the party seeking to void the transaction must establish usury by clear and convincing evidence.  *See Zhavoronkin v. Koutmine*, 860 N.Y.S.2d 561, 562 (N.Y. App. Div. 2008); *Jimenez v. Acheson*, 840 N.Y.S.2d 648, 649 (N.Y. App. Div. 2007).

Defendants concede, as they must, that under New York law that Agreements were not "loans," and thus cannot be usurious. As just noted, where a purported lender does not have an absolute right to repayment, the transaction is not a loan and the usury statute is inapplicable. Here, there is no dispute that CaseFunding had no absolute right to repayment under the Agreements. The Agreements explicitly provide that CaseFunding's right to payment is contingent upon defendants' success in the underlying state court litigation, that its right to payment is limited to the amount recovered through verdict or settlement, and that it has no right to payment if no recovery is obtained. *See* Agreement, ¶ 3. Because CaseFunding's right to payment was contingent upon success and recovery in the underlying lawsuit, the transactions were not "loans" and the New York usury statute does not render them invalid. *See Lynx Strategies, LLC v. Ferreira*, No. 104843/10, 2010 WL 2674144, at * (N.Y. Sup. Ct. July 6, 2010) ("The instant transaction . . . is an ownership interest in proceeds for a claim, contingent on the actual existence of any proceeds. Had respondent been unsuccessful in negotiating a settlement or winning a judgment, petitioner would have no contractual right to payment. Thus, usury does not apply to the instant case."); *see also*, *O'Farrell v. Martin*, 292 N.Y.S. 581, 583-84 (N.Y. City Ct. 1936).

Defendants do argue, however, that even under New York law the second agreements between CaseFunding and defendants Lofton and Madison were usurious, because when those agreements were entered into the defendants in the underlying state court litigation had already agreed to settle with the class for $100 million. Defendants contend that these agreements, entered into on June 16, 2009, were effected six days after the state court defendants had agreed to settle with the class, and thus "there was no question that at the time th[ese] advance[s] w[ere] made, both Ms. Lofton and Ms. Madison were definitely going to recover some damages." Br. in Supp. of

20

Def.s' Mot. for Summ. J., at 12.  In support of this argument, defendants rely on the Michigan Court of Appeals's decision in *Lawsuit Financial, L.L.C v. Curry*, 261 Mich. App. 579, 683 N.W.2d 233 (2004).  Defendants cite, however, no New York law on point in support of their position.

As noted above, under New York law the usury statute is applicable only to loans, and the New York courts are clear that for a transaction to be considered a loan there must be a right to "'repayment *absolutely* and *at all events*.'"  *Zoo Holdings*, 2006 WL 297730, at *4 (quoting *Rubenstein*, 75 N.Y.S.2d at 485) (emphasis added); *see also*, *Transmedia Restaurant*, 710 N.Y.S.2d at 760.  Here, even if the defendants had agreed to settle, there was not an absolute right to repayment at the time the second agreements were executed because the settlement had not been agreed to by the plaintiffs.  Class counsel in the state court litigation did not inform the state court plaintiffs of the proposed settlement until her July 6, 2009, letter advising the plaintiffs of the proposed settlement and encouraging the plaintiffs to accept the settlement.  *See* Br. in Supp. of Pl.s' Mot. for Summ. J., Ex. O.  Indeed, that letter indicates that the tentative settlement was reached not on June 9, but rather on June 30, 2009, after the second agreements had been executed.  *See id*.  In any event, at the time the second agreements were executed the settlement had neither been accepted by the state court plaintiffs nor been approved by the trial court.  Whether likely or not, there still remained the possibility that one or more of the litigants would decline to accept the settlement, or that the trial court would not approve the settlement.  Thus, at the time the second agreements were entered into, CaseFunding did not have a right to "repayment absolutely and at all events."  Its right to payment remained contingent on events that were yet to occur, namely, acceptance of the settlement by the state court plaintiffs and approval by the trial court.  Under New York law, this is sufficient to take the agreements outside the scope of the usury statute.

Further, under New York law "[i]ntent to overcharge is an essential and necessary element of usury." *Leibovici v. Rawicki*, 290 N.Y.S.2d 997, 1001 (N.Y. City Ct. 1968). "There must exist, in fact or in law, a corrupt purpose or intent on the part of the person who takes the security to secure an illegal rate of interest for the loan or forbearance of money." *Orvis v. Curtiss*, 52 N.E. 690, 691 (N.Y. 1899). Under this rule, "a bona fide mistake of fact vitiates usurious intent." *Freitas v. Geddes Sav. & Loan Ass'n*, 471 N.E.2d 437, 443 (N.Y. 1984). Here, there is no evidence, much less clear and convincing evidence, to establish that CaseFunding had a usurious intent. Even if a settlement had been reached as of the date of the second agreements which rendered CaseFunding's right to payment absolute, there is no evidence that CaseFunding knew of this settlement at the time the second agreements were executed. Defendants cite only an e-mail from one attorney in the underlying state court action to other attorneys in the state court action pre-dating the second agreements indicating that a settlement had been reached as to monetary issues. *See* Br. in Supp. of Def.s' Mot. for Summ. J., Ex. 7. There is no evidence, however, that CaseFunding knew of this proposed settlement, and thus intended to "secure an illegal rate of interest for the loan or forbearance of money." Rather, CaseFunding's intent at that time, based on the information then available to it, was to enter into a contingent purchase agreement, not a loan of money. Because there was no usurious intent, and because in any event CaseFunding did not have an absolute right to repayment when it executed the second agreements with defendants Lofton and Madison, these second agreements are not void under the usury statute.

Because the Agreements entered into between CaseFunding and defendants were not loans subject to the New York usury statute, and because there is no genuine issue of material fact that defendants have breached the Agreements, the Court should grant summary judgment to plaintiffs

on their breach of contract and anticipatory breach of contract claims.

      3.     *Analysis under Michigan Law*

Although I recommend that the Court conclude New York applies pursuant to both the parties' contractual choice of law and Michigan's ordinary conflict of law principles, for the sake of completeness I analyze defendants' argument that the Agreements are usurious under Michigan law, in the event the Court disagrees with my analysis of the choice of law provision.

On its face, the Michigan usury statute is broader than the New York statute. The Michigan statute provides, in relevant part: "The interest of money shall be at the rate of $5.00 upon $100.00 for a year, and at the same rate for a greater or less sum, and for a longer or shorter time, except that in all cases it shall be lawful for the parties to stipulate in writing for the payment of any rate of interest, not exceeding 7% per annum." MICH. COMP. LAWS § 438.31. By its terms, the statute is not limited to a "loan" or "forbearance." In *dicta*, the Michigan Supreme Court has observed that this statute is broader than many other usury statutes, because the statute applies not only to the "loan of money or the extension of pre-existing debts, but also [to] all contracts and assurances." *Black v. Contract Purchase Corp.*, 327 Mich. 636, 643, 42 N.W.2d 768, 772 (1950); *see also*, *Hillman's v. Em 'N Al's*, 345 Mich. 644, 651, 77 N.W.2d 96, 101 (1956).[8] From this statement in *Black*, reiterated in *Hillman's*, defendants argue that the Michigan usury statute prohibits any "charges, whatever their specific character or label, that aggregate in excess of seven percent annual simple interest." Br. in Supp. of Def.s' Mot. for Summ. J., at 12. Michigan law, however, does not support this argument.

---

        [8]*Black* involved installment sales on credit, which the court determined to be outside the scope of the usury statute. *Hillman* remanded for a determination of whether the contract was actually a credit sale or a loan subject to the usury statute.

It is true that *Black* recognized that the usury statute applies to all contracts. However, the *Black* court itself recognized that what is prohibited by the usury statute is an illegal rate of interest. Specifically, the court stated that the usury statute "includes *interest* not only on the loan of money or the extension of pre-existing debts, but also on all contracts and assurances." *Black*, 327 Mich. at 643, 42 N.W.2d at 772 (emphasis in original). The *Black* court itself emphasized the word "interest," and concluded that a discount rate on the purchase of commercial paper did not constitute interest prohibited by the usury statute. The court also concluded that the underlying installment sales contracts were not usurious, because a seller may charge a different price for goods sold on credit than that charged on goods sold for cash. Similarly, in *Hillman's* the court remanded for a determination of whether the transaction at issue involved a charge of interest, or merely a discount on the sale of commercial paper. Under defendants' view of Michigan law, these cases could not have been decided as they were–the simple fact that there was some charge in excess of the legal rate prescribed by the usury statute would have resulted in a finding that the contracts were usurious.

Defendants' interpretation of *Black* and *Hillman's*, apart from being not supported by their language, runs afoul of the long established rule in Michigan that interest and usury statutes, being in derogation of the common law, are to be strictly construed. *See Marion v. City of Detroit*, 284 Mich. 476, 484, 280 N.W. 26, 29 (1938); *Trieweiler v. Varnum, Riddering, Schmidt & Howlett, L.L.P.*, No. 256511, 2006 WL 1161546, at *3 (Mich. Ct. App. May 2, 2006) (per curiam). Their interpretation also reads out of the statute the word "interest," replacing it with the word "charge." *Black* itself, however, highlighted the word interest, and concluded that a discount rate on the sale of commercial paper, which could certainly constitute a "charge," was not "interest" under the usury statute. Thus, the real question before the Court is not whether the Agreements are subject to the

24

usury statute, but rather whether the charges reflected in the Agreements constitute "interest" under the Michigan usury statute. The Court should conclude that they are not.

Under Michigan law, in a variety of contexts, interest is defined as a fixed rate paid for the use or forbearance of money, pursuant to a contract or by law. *See Town & Country Dodge, Inc. v. Department of Treasury*, 420 Mich. 226, 242, 362 N.W.2d 618, 626 (1984); *Balch v. Detroit Trust Co.*, 312 Mich. 146, 152, 20 N.W.2d 138, 141 (1945); *Marion*, 284 Mich. at 484, 280 N.W. at 29; *Eames v. Barber*, 192 Mich. 1, 14, 158 N.W. 218, 223 (1916); *Perry Drug Stores, Inc. v. Department of Treasury*, 229 Mich. App. 453, 463, 582 N.W.2d 533, 538 (1998). Here, for the same reason that the Agreements do not constitute loans under New York law, they do not charge interest under Michigan law. Because there is no guarantee of repayment, the charges in the Agreements are not a fixed rate for the use or forbearance of money; rather, they are a negotiated rate of return on an investment, payable in the event that the contingency occurs. *Lawsuit Financial*, *supra*, upon which defendants rely, supports this conclusion.

In *Lawsuit Financial*, the court considered an agreement similar to those involved here, which provided a capital advance in exchange for an agreed-upon return on investment if the defendant was successful in his underlying state court action. While the court found that the agreement in that case was usurious under the Michigan usury statute, it did not do so on the basis advanced by defendants here, *i.e.*, that the usury statute prohibits all "charges" in excess of 7% in any contract. Rather, the court construed the issue as being whether the contingent advances were actually loans with an absolute right of repayment. The court explained:

> Contrary to plaintiff's arguments, the "contingent advances" were actually loans. "The hallmark of a loan is the *absolute* right to repayment." *Blackwell Ford, Inc. v. Calhoun*, 219 Mich. App. 203, 209, 555 N.W.2d 856 (1996) (emphasis in original). The word "loan" implies an advance of money with an absolute promise

25

to repay.  *Id*., at 209-210, 555 N.W.2d 856, quoting *People v. Lee*, 447 Mich. 552, 559, 526 N.W.2d 882 (1994).

*Lawsuit Financial*, 261 Mich. App. at 588, 683 N.W.2d at 239.  The court went on to conclude that the advances in that case were loans because at the time they were made the defendant in the underlying suit had already admitted liability, the borrower had obtained a jury verdict and judgment had been entered, and the only remaining issues after judgment went to the propriety of the amount of the verdict, not to liability.  *See id*. at 588-89, 683 N.W.2d at 239.  The court reasoned that "[b]ecause liability had already been admitted when plaintiff advanced the funds, the fact that defendant Curry would recover some damages for her injuries was already known.  Therefore, plaintiff was entitled to an absolute right of repayment."  *Id*. at 589, 683 N.W.2d at 239.  Contrary to defendants' argument here as to the provisions of Michigan law, the *Lawsuit Financial* court focused on the absolute right to repayment as the dispositive factor in determining whether the usury statute applied to the loan.  Had that court viewed Michigan law as providing for the rule asserted by defendants here, its discussion of whether there was an absolute right to payment would be irrelevant; it would have been enough for the court to simply observe that the contract contained a charge above the 7% limit set by the usury statute.  *Cf. Dimmitt & Owens Fin., Inc. v. Realtek Indus., Inc.*, 90 Mich. App. 429, 436, 280 N.W.2d 827, 830 (1979) ("The usury statute . . . is inapplicable because . . . the instant situation does not involve refinancing or the making of loans.").

Applying the *Lawsuit Financial* analysis here, plaintiffs are entitled to summary judgment because there was no absolute right to repayment.  Rather, as explained above in the discussion of New York law, CaseFunding's right to payment was contingent upon defendants' success in the underlying lawsuit.  While it is true that a judgment had been entered in the underlying suit, as one had been entered in *Lawsuit Financial*, unlike in that case here the state court defendants had not

admitted liability at the time the Agreements were executed.  On the contrary, the state court defendants were appealing on the basis that the Civil Rights Act did not apply to prisoners, and that in any event they were not liable for the alleged harassment.  As counsel for the state court plaintiffs (defendants here) repeatedly acknowledged, while this appeal was pending–which it was at the time all of the Agreements were executed–there remained a substantial risk that the Michigan Supreme Court would reverse the judgment and that the state court plaintiffs would not recover on their claims.  *See* Br. in Supp. of Pl.s' Mot., Exs. N & O.  Thus, there was no absolute right to payment and, under the reasoning of *Lawsuit Financial*, this fact is sufficient to take the Agreements outside the scope of the Michigan usury statute.  Accordingly, the Court should conclude that plaintiffs are entitled to summary judgment even if Michigan law is applied to the Agreements.[9]

E.      *Conclusion*

        In view of the foregoing, the Court should conclude that there are no genuine issues of material fact and that plaintiffs are entitled to judgment as a matter of law.  Specifically, the Court should conclude that New York law governs the Agreements, and that under New York law the Agreements are not usurious.  Alternatively, the Court should conclude that even if Michigan law

---

        [9]If the Court disagrees with my conclusions both that New York law applies and that the Agreements are not usurious under Michigan law, each party would be entitled to partial summary judgment.  As noted above, under Michigan law a contract that provides for a usurious rate of interest is not void.  *See Heide v. Hunter Hamilton Ltd. Partnership*, 826 F. Supp. 224, 229 (E.D. Mich. 1993) (Feikens, J.); *Bebee v. Grettenberger*, 82 Mich. App. 416, 423, 266 N.W.2d 829, 832 (1978).  Rather, usury may be asserted only as a defense by the borrower in an action brought by the lender to enforce the debt, and then only to the extent of prohibiting the lender from recovering interest; the borrower remains liable to pay the principal.  *See Lincoln Nat'l Bank v. Kaufman*, 406 F. Supp. 448, 451 (E.D. Mich. 1976) (Kennedy, J.); *Osinski v. Yowell*, 135 Mich. App. 279, 287-88, 354 N.W.2d 318, 322 (1984); MICH. COMP. LAWS § 438.32.  Thus, if the Court concludes that Michigan law applies and that the Agreements are usurious under Michigan law, plaintiffs are still entitled to summary judgment on their breach of contract claims with respect to the principal advanced to defendants, while defendants are entitled to summary judgment to the extent plaintiffs are seeking any amount beyond the principal sums advanced to defendants.  *See Lawsuit Financial*, 261 Mich. App. at 587, 591, 683 N.W.2d at 238, 240.

applies, the Agreements are not usurious under the Michigan usury statute. Accordingly, the Court should grant plaintiffs' motion for summary judgment and deny defendants' motion for summary judgment.

III.   NOTICE TO PARTIES REGARDING OBJECTIONS:

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in FED. R. CIV. P. 72(b). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Federation of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court. The response shall address specifically, and in the same order raised, each issue contained within the objections.


s/Paul J. Komives _____
PAUL J. KOMIVES
UNITED STATES MAGISTRATE JUDGE

Dated: 1/23/11

28

The undersigned certifies that a copy of the foregoing order was served on the attorneys of record and   by electronic means or U.S. Mail on January 20, 2012.

s/Eddrey Butts
Case Manager