UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MONEYFORLAWSUITS V LP
d/b/a MFL CASEFUNDING, a Delaware
limited partnership, and
GUARDIAN ADVISORS LP II
d/b/a MFL CASEFUNDING, a Delaware
limited partnership,

                 Plaintiffs,                             Case No. 4:10-cv-11537-MAG-PJK

v.                                                  Hon. Mark A. Goldsmith

TAMMY ROWE a/k/a TAMMY LACROSS,
CARRIE FLEMION, LURA L. GIPSON,
ROXANNE LOFTON, DELORES MADISON,
WENDY GARAGIOLA, PAMELA MOFFIT,
all Michigan citizens, and VIVIAN
AROUSELL, an Indiana citizen,

                 Defendants.
_____/

## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
## AS TO DEFENDANT CARRIE FLEMION

      Plaintiff Guardian Advisors LP II d/b/a MFL CaseFunding ("CaseFunding"), by its

attorneys, hereby moves the Court for an Order granting CaseFunding summary judgment under

Fed. R. Civ. P. 56 on its breach of contract claims against Defendant Carrie Flemion. In support

of its motion, CaseFunding states as follows:

      1.      CaseFunding is in the business of investing in claims and lawsuits by purchasing

the right to receive a portion of settlement or judgment proceeds from parties engaged in

litigation. In exchange for CaseFunding providing funding to plaintiffs in pending lawsuits,

plaintiffs assign the right to a portion of potential future proceeds, contingent on there being any

such proceeds.

      2.      CaseFunding entered into a Contingent Proceeds Purchase Agreement

("Contingent Purchase Agreement") with Defendant Carrie Flemion in June 2009, when she was

a member of a plaintiff class in a class action against the Michigan Department of Corrections and others (the "Class Action").  (Ex. A to Brief in Support.)[1]

3.      The Contingent Purchase Agreement states that Defendant Flemion "underconditionally and irrevocably grants, assigns, transfers and conveys" a portion of any potential proceeds from a settlement or judgment to CaseFunding.  (*Id.*, p. 2 ¶ 3, emphasis added.)

4.      The Contingent Purchase Agreement states (*Id.*):

> If the Proceeds are insufficient to pay Purchaser's Share, then Purchaser's Share will be limited to the Proceeds from the Claim.
>
> If the Seller does not recover any money from the Claim, then the Seller shall owe nothing to Purchaser.

5.      The Contingent Purchase Agreement states that "[i]n the event of any legal action or proceeding to interpret of enforce this Agreement, the prevailing party shall be entitled to recover its reasonable attorneys' fees and expenses incurred therein from the other party."  (*Id.*, ¶ 27, emphasis added.)

6.      Pursuant to its Contingent Purchase Agreement with Defendant Flemion, CaseFunding provided approximately $154,500.00 in funding to or on behalf of Defendant Flemion.

7.      On August 21, 2009, the Washtenaw County Circuit Court entered an Order Granting Final Approval of Settlement, Plan of Allocation, and Order of Distribution in the Class Action (the "Final Settlement Order").  (Ex. B.)  The Final Settlement Order approved a settlement of the Class Action in the total amount of One Hundred Million Dollars ($100,000,000.00) and a Plan of Allocation for allocating and distributing the settlement proceeds.  (*Id.*; Ex. C, Plan of Allocation.)

_____

[1] All exhibit references are to exhibits to CaseFunding's Brief in Support.

8.     The Plan of Allocation provides for the distribution of Seventy-One Million Two Hundred Eighty Thousand Dollars ($71,280,000.00) to members of the plaintiff class in the Class Action over a period of six (6) years, through October 2014.  (Ex. C, p. 4.)

9.     The Plan of Allocation provides that Defendant Flemion will receive ten percent (10%) of her settlement proceeds in 2009, ten percent (10%) in October 2010, fifteen percent (15%) in October 2011, twenty percent (20%) in October 2012, twenty percent (20%) in October 2013 and twenty-five (25%) in October 2014.  (*Id.*)

10.    Defendant Flemion's portion of the settlement proceeds totals $1,300,000.00.

11.    The Contingent Purchase Agreement states:

> Purchaser's [CaseFunding's] share shall be paid to Purchaser in full on the date the Proceeds are received.  Purchaser's share shall be withheld from any money collected as a result of the Claim and paid to Purchaser immediately upon collection without set-off or reduction of any kind.
> * * *
> Seller will not receive any money from the Proceeds of the Claim until Purchaser has been paid in full.
> In the event the proceeds are received in multiple payments, whether pursuant to a structured settlement, annuity, or other form of installment payment or incremental recovery, Purchaser's [CaseFunding's] right to receive full payment of its Share from such Proceeds shall be prior and senior to the Seller's [Defendant's] rights to receive any portion of the Proceeds.

(*Id.*, emphasis added.)

12.    In 2009, 2010 and 2011 Defendant Flemion received a total of 35% of her portion of the settlement payments, which is $455,000.00.

13.    Defendant Flemion failed to pay to CaseFunding amounts received from the first three installments of her portion of the settlement proceeds from the Class Action in 2009, 2010 and 2011.

14.    Defendant Flemion has breached the Contingent Purchase Agreement by failing to pay CaseFunding under the terms of the Contingent Purchase Agreement.

15.     On January 23, 2012 Magistrate Judge Komives issued a Report and Recommendation on the Parties' Cross-Motions for Summary Judgment as to Defendants Lura Gipson, Roxanne Lofton, Delores Madison, Wendy Garagiola, Pamela Moffit and Vivian Arousell (collectively the "Co-Defendants") ("R&R"), which addresses the same legal issues and nearly identical facts as the instant motion.  [DE 206, attached as Ex. J.]

16.     On March 29, 2012, the Court entered an Opinion and Order (1) Accepting and Adopting the Magistrate Judge's Report and Recommendation, (2) Granting Plaintiff's Motion for Summary Judgment, and (3) Denying Defendants' Motion for Summary Judgment ("Summary Judgment Order").  [DE 214, attached as Ex. K.]

17.     The Court entered Judgments against Co-Defendants Gipson, Lofton, Madison, Garagiola, Moffit, and Arousell on April 16, 2012.  [DE 217-222.]

18.     The Co-Defendants executed Contingent Purchase Agreements materially identical to the Agreement executed by Defendant Flemion.  The Co-Defendants accepted funds from CaseFunding and had a contingent obligation to pay CaseFunding per the terms of the Agreements, just like Defendant Flemion.

19.     The R&R and the Summary Judgment Order analyze both Michigan and New York law regarding the exact issues pending before this Court in the instant motion and discussed in greater detail in the attached brief.  The R&R and the Summary Judgment Order provide thorough and well-reasoned support for granting  CaseFunding's Motion for Summary Judgment as to Defendant Flemion.

20.     The arguments presented by CaseFunding in the summary motion as to the Co-Defendants are substantively the same as those present in the instant motion as to Defendant Flemion, as are the Contingent Purchase Agreements at issue.  *(Compare* Ex. A here to Exs. A-H of [DE 188]).

21.     As the Court recognized in quoting the R&R in the Summary Judgment Order [DE 214, p. 2, citing R&R, p. 8]:

4

there are no genuine issues of fact present, there is no dispute concerning the terms of the Agreements, and there is no dispute that defendants have breached the Agreements by failing to pay to CaseFunding its share of the proceeds from the settlement. Rather, [t]he only disputed issue in this case is whether the Contingent Purchase Agreements are enforceable contracts." Br. in Supp. of Def.s' Mot. for Summ. J., at 1.

22.     There are also no disputed issues of fact with respect to the claims against Defendant Flemion. Plaintiff is entitled to summary judgment on its contract claims against Flemion.

23.     As of the filing of this motion, Defendant Flemion owes CaseFunding $812,572.75 under the terms of the Contingent Purchase Agreement.

24.     Plaintiff is entitled to a Judgment from the Court under its contract claims against Defendant Carrie Flemion.

25.     Pursuant to LR 7.1(a), counsel for CaseFunding and Defendant spoke multiple times prior to May 9, 2012 , during which discussions counsel for CaseFunding sought concurrence in the relief sought in this motion. Defendant Flemion did not concur.

WHEREFORE, for all of the foregoing reasons and those set forth in the accompanying Brief in Support, Plaintiff CaseFunding respectfully requests that the Court grant it summary judgment under Fed. R. Civ. P. 56 on its breach of contract claims against Defendant Carrie Flemion. Plaintiff further requests that the Court enter a Judgment against Defendant Flemion in the amount of $812,572.75, plus attorney fees, costs and post-judgment interest.

Respectfully submitted,

WILLIAMS, WILLIAMS, RATTNER & PLUNKETT, P.C.

/s/ David E. Plunkett
David E. Plunkett (P66696)
Susan A. Babcock (P71946)
Attorneys for Plaintiffs
380 N. Old Woodward Ave., Suite 300
Birmingham, MI  48009
(248) 642-0333
dep@wwrplaw.com
sab@wwrplaw.com

Dated:  May 10, 2012

5

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MONEYFORLAWSUITS V LP
d/b/a MFL CASEFUNDING, a Delaware
limited partnership, and
GUARDIAN ADVISORS LP II
d/b/a MFL CASEFUNDING, a Delaware
limited partnership,

               Plaintiffs,

v.

TAMMY ROWE a/k/a TAMMY LACROSS,
CARRIE FLEMION, LURA L. GIPSON,
ROXANNE LOFTON, DELORES MADISON,
WENDY GARAGIOLA, PAMELA MOFFIT,
all Michigan citizens, and VIVIAN
AROUSELL, an Indiana citizen,

               Defendants.

_____/

Case No. 4:10-cv-11537-MAG-PJK
Hon. Mark A. Goldsmith

## BRIEF IN SUPPORT OF PLAINTIFF'S MOTION
## FOR SUMMARY JUDGMENT AS TO DEFENDANT CARRIE FLEMION

<u>STATEMENT OF ISSUE PRESENTED</u>

1.  Whether the Court should grant Plaintiff summary judgment under Fed. R. Civ. P. 56 on its breach of contract claims against Defendant Carrie Flemion.

    Plaintiff answers YES

### Controlling / Most Appropriate Authority

Fed. R. Civ. P. 56

*Blackwell Ford, Inc. v. Calhoun*, 219 Mich. App. 203; 555 N.W.2d 856 (1996)

*Kipin Indus., Inc. v. Van Deilen Int'l, Inc.,* 182 F.3d 490 (6th Cir. 1999)

*Hudson v. Mathers*, 283 Mich. App. 91; 770 N.W.2d 883 (2009).

*Milne v. Accurcast, Inc.*, 2010 U.S. Dist. LEXIS 5311 (E.D. Mich. Jan. 25, 2010)

NY CLS Gen. Oblig. § 5-501 (2011)

# TABLE OF CONTENTS

TABLE OF CONTENTS .................................................................................................iii

INDEX OF AUTHORITIES ..........................................................................................iv

STATEMENT OF MATERIAL FACTS ........................................................................ v

INTRODUCTION ........................................................................................................... 1

LEGAL STANDARD ...................................................................................................... 1

ARGUMENT.................................................................................................................... 2

      1.     Defendant Flemion's anticipated "usurious loans" argument has no
merit................................................................................................................. 3

      2.     New York Law Applies to the Agreement ........................................... 6

      3.     Michigan Does Not Have a Materially Greater Interest....................... 8

      4.     Even if Michigan Law Applied, the Agreement Is Not Usurious ...... 10

      5.     Possible Consumer Protection Act arguments are without merit ....... 12

            a.     The Contingent Purchase Agreement does not violate
MCL § 445.903(z) ................................................................... 12

            b.     The Contingent Purchase Agreement does not violate the
MCPA's disclosure provisions or provisions against taking
advantage of consumers who cannot understand the transaction
at issue .................................................................................... 13

      CONCLUSION ......................................................................................... 15

00698303.DOCX

## INDEX OF AUTHORITIES

*Cases:*                                                                 Page(s)

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)......................................................1

*Black v. Contract Purchase Corp.,* 327 Mich. 636; 42 N.W.2d 768 (1950)......................4

*Blackwell Ford, Inc. v. Calhoun*, 219 Mich. App. 203; 555 N.W.2d 856 (1996)..........3, 4

*Conrad v Atlantic Ins. Co.*, 26 U.S. 386 (U.S. 1828) .......................................................5

*Donatelli v. Siskind,* 170 A.D.2d 433; 565 N.Y.S.2d 224 (1991).............................9

*Fed. Home Loan Mortg v. Hulet*, 2006 U.S. Dist. LEXIS 933 (2006)...............................1

*Fried v. Bolanos*, 187 A.D.2d 108; 592 N.Y.S.2d 144 (1993).................................9

*Hudson v. Mathers*, 283 Mich. App. 91; 770 N.W.2d 883 (2009)..................................6, 7

*Kaneff v Delaware Title Loans Inc*, 587 F.3d 616 (3rd Cir 2009)....................................11

*Kipin Indus., Inc. v. Van Deilen Int'l, Inc.,* 182 F.3d 490 (6th Cir. 1999)......................6, 7

*Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487 (1941)...............................................6

*Lawsuit Financial, L.L.C. v. Curry*, 261 Mich. 579; 246 N.W.2d 504 (2004)........5, 10, 11

*Milne v. Accurcast, Inc.*, 2010 U.S. Dist. LEXIS 5311 (E.D. Mich. Jan. 25, 2010) .......7, 8

*Odell v Legal Bucks, LLC*, 665 S.E.2d 767 (N.C. Ct. App. 2008) ...................................12

*Seidel v. 18 E. 17th St. Owners*, 79 N.Y.2d 735; 586 N.Y.S.2d 240 (1992).................9

*Stevenson v Unkefer*, 14 Ill. 103 (Ill. 1852).......................................................................5

*Turcheck v. Amerifund Fin., Inc.*, 272 Mich. App. 341; 725 N.W.2d 684 (2006) ..............6

*Vinch v Lawsuit Financing, Inc.*, No. 2004-3963 (Mich. Cir. Ct. Feb. 28, 2005).............10

*Other:*

Fed. R. Civ. P. 56(c) ..........................................................................................................1

Michigan Consumer Protection Act, MCL § 445.901 et seq. ...........................................12

iv

## STATEMENT OF MATERIAL FACTS

1.     Plaintiff Guardian Advisors LP II d/b/a MFL CaseFunding ("CaseFunding") is in the business of investing in claims and lawsuits by purchasing the right to receive a portion of settlement or judgment proceeds from parties engaged in litigation.  [DE 1, Complaint, ¶ 14.]

2.     In exchange for CaseFunding providing funding to plaintiffs in pending lawsuits, plaintiffs assign the right to potential future proceeds, contingent on there being any such proceeds.  [*Id.*]

### Procedural Posture as to Co-Defendants

3.     On January 23, 2012 Magistrate Judge Komives issued his Report and Recommendation on the Parties' Cross-Motions for Summary Judgment as to Defendants Lura L. Gipson, Roxanne Lofton, Delores Madison, Wendy Garagiola, Pamela Moffit, and Vivian Arousell (collectively the "Co-Defendants"), which addresses the same legal issues and materially identical facts as the instant motion ("R&R").  [DE 206, attached as Ex. J.]

4.     On March 29, 2012, the Court entered an Opinion and Order (1) Accepting and Adopting the Magistrate Judge's Report and Recommendation, (2) Granting Plaintiff's Motion for Summary Judgment, and (3) Denying Defendants' Motion for Summary Judgment ("Summary Judgment Order").  [DE 214, attached as Ex. K.]

5.     The Court entered Judgments against Co-Defendants Gipson, Lofton, Madison, Garagiola, Moffit and Arousell on April 16, 2012.  [DE 217-222.]

6.     The Co-Defendants executed Contingent Purchase Agreements materially identical to the Agreement executed by Defendant Carrie Flemion ("Flemion").  The Co-Defendants accepted funds from CaseFunding and had a contingent obligation to pay CaseFunding per the terms of the Agreements, just like Flemion.

7.     The R&R and the Summary Judgment Order analyze both Michigan and New York law regarding the exact issues pending before this Court in the instant motion.

**CaseFunding's Agreement with Defendant Flemion**

8.      CaseFunding entered into Contingent Proceeds Purchase Agreement ("Contingent Purchase Agreement") with Defendant Flemion on or about June 26, 2009, when she was a member of a plaintiff class in a class action against the Michigan Department of Corrections and others (the "Class Action").  (Ex. A.)

9.      Flemion executed the Contingent Purchase Agreement and initialed every page of the Agreement.  (*Id.*)

10.      The Contingent Purchase Agreement, evidences that CaseFunding provided a total of $154,500.00 in funding to Defendant Flemion or on her behalf.  (*Id.*, Consumer Disclosure Statement, p. 2 and Agreement, pp. 1, 2, & 9.)

11.      CaseFunding provided $150,000 in funds directly to Flemion and paid a processing fee of $4,500 to QuickCash, Inc. for administration and underwriting services.  (*Id.*)

**The Terms of the Contingent Purchase Agreement**

12.      The Contingent Purchase Agreement states that Flemion "unconditionally and irrevocably grants, assigns, transfers and conveys" a portion of any potential proceeds from a settlement or judgment to CaseFunding.  (Ex A, Agreement, p. 2 ¶ 3, emphasis added.)

13.      The Contingent Purchase Agreement states:

> Purchaser's [CaseFunding's] share shall be paid to Purchaser in full on the date the Proceeds are received.  Purchaser's share shall be withheld from any money collected as a result of the Claim and paid to Purchaser immediately upon collection without set-off or reduction of any kind.  The amount due shall be paid immediately after attorney fees (including expenses charged by the Seller's attorney for costs) and after payment to any recorded lien holders that might exist prior to the date hereof, or which may have priority by law.  Seller will not receive any money from the Proceeds of the Claim until Purchaser has been paid in full.
>
> In the event the proceeds are received in multiple payments, whether pursuant to a structured settlement, annuity, or other form of installment payment or incremental recovery, Purchaser's right to receive full payment of its Share

vi

> from such Proceeds shall be prior and senior to the Seller's rights to receive
> any portion of the Proceeds.

(*Id.*, emphasis added.)

14.   The Contingent Purchase Agreement states:

> If the Proceeds are insufficient to pay Purchaser's Share, then Purchaser's
> Share will be limited to the Proceeds from the Claim.

> If the Seller does not recover any money from the Claim, then the Seller shall
> owe nothing to Purchaser.

(*Id.,* emphasis added.)

15.   Defendant agreed under the Contingent Purchase Agreement, among other things,
to "(ii) cooperate with Purchaser regarding matters described in this Agreement; and (iii) notify
Purchaser of any verdict, award, settlement, discontinuance or ending with respect to the Claim. .
. ." (*Id.*, p. 4, ¶ 11.)

16.   The Contingent Purchase Agreement states:

> Seller hereby waives any defense to payment of the sums due and promises
> not to seek to avoid payment of any money due to Purchaser under this
> Agreement. . . . In the event of a violation or threatened violation by Seller of
> the covenants and Agreement contained in this Agreement, Purchaser, in
> addition to and not in limitation of, any other right, remedies or damages
> available to Purchaser at law or in equity, shall be entitled to equitable relief
> as may be appropriate, including an order for specific performance.

(*Id.*, p. 4-5, ¶ 14.)

17.   The Contingent Purchase Agreement sets forth in plain language the monthly and
annualized rates of return in numerous places in the Agreement.  (Ex. A, Consumer Disclosure
Statement, pp. 1 & 2 and Agreement, pp. 1, 2 & 9.)

18.   The Contingent Purchase Agreement contains multiple tables showing the exact
amounts that would be owed under the Agreement at monthly and six-month intervals if the
Flemion were to recover in the Class Action.  (*Id.*)

vii

19.     The Consumer Disclosure Statement in the Agreement states: "The Agreement evidences a purchase and sale of a portion of the Proceeds from the Claim.  It does not represent a loan to you."  (*Id.*, p. 1.)

20.     The Consumer Disclosure Statement also makes clear that the Agreement involves the sale of "a portion of the contingent proceeds you may receive from the recovery of a claim or lawsuit" and that Defendant Flemion "hope[s] to receive proceeds in the future" from a lawsuit or claim.  (*Id.*, p. 1.)

21.     The Contingent Purchase Agreement also provides (*Id.,* ¶¶ 24-26):

> Seller has been advised and understands that the cost of selling a portion of the Proceeds to Purchaser is potentially expensive and should only be used as a last resort and that Purchaser may make a substantial profit from its investment by the terms of this Agreement. Other sources of funding, including loans, may be available at more favorable rates, payment schedules, terms and conditions.

> Seller has had a full and complete opportunity to consult with an attorney and other advisors before signing this Agreement. This Agreement has been fully explained to Seller, and all questions that Seller might have about this transaction have been fully explained.  In no event shall the fee agreement between the Seller and the Attorney be changed in any way that could reduce the amount of the Proceeds payable to Purchaser under this Agreement.

> Seller may rescind this Agreement within 5 business days following the Seller's receipt of funds from Purchaser, provided, however, that Seller must provide written notice of rescission and return the Purchase Price to Purchaser simultaneously with the rescission. . . . .

22.     The Contingent Purchase Agreement includes an Attorney Acknowledgement, in which  Defendant Flemion's attorney states that he has reviewed and explained the terms of the Agreement to his client, including the monthly and annualized rates of return.  (Ex. A at Ex. C.)

**Settlement of the Class Action**

23.     On August 21, 2009, the Washtenaw County Circuit Court entered an Order Granting Final Approval of Settlement, Plan of Allocation, and Order of Distribution in the Class Action (the "Final Settlement Order").  (Ex. B.)

viii

24.     The Final Settlement Order approved a settlement of the Class Action in the total amount of One Hundred Million Dollars ($100,000,000.00) and a Plan of Allocation for allocating and distributing the settlement proceeds. (*Id.*; Ex. C, Plan of Allocation.)

25.     The Plan of Allocation provides for the distribution of Seventy-One Million Two Hundred Eighty Thousand Dollars ($71,280,000.00) to members of the plaintiff class in the Class Action over a period of six (6) years, through October 2014. (Ex. C, p. 4.)

26.     The Plan of Allocation provides that Defendants will each receive ten percent (10%) of their settlement proceeds in 2009, ten percent (10%) in October 2010, fifteen percent (15%) in October 2011, twenty percent (20%) in October 2012, twenty percent (20%) in October 2013 and twenty-five (25%) in October 2014. (*Id.*)

27.     The Final Settlement Order and the Plan of Allocation call for an escrow agent to receive and distribute the settlement proceeds to members of the Plaintiff Class, including those members who are Defendants here. (Exs. B & C.)

28.     Defendant Flemion failed to notify CaseFunding of the settlement in the Litigation. [DE 1, ¶30.]

29.     Defendant Flemion's total portion of the settlement proceeds is $1,300,000.00.

30.     Defendant Flemion received the first installment of her portion of the settlement proceeds in late 2009 in the amount of $130,000.

31.     Defendant Flemion received the second installment of her portion of the settlement proceeds in late 2010 in the amount of $130,000.

32.     Defendant Flemion received the third installment of her portion of the settlement proceeds in late 2011 in the amount of $195,000.

33.     Defendant Flemion failed to notify CaseFunding of her receipt of settlement proceeds from the Litigation. [DE 1, ¶ 31.]

00698303.DOCX

34.     To date, Defendant Flemion has paid nothing ($0.00) to CaseFunding toward satisfaction of the Contingent Purchase Agreement.

35.     As of today Defendant Flemion owes CaseFunding $812,572.75 under the terms of the Contingent Purchase Agreement.  (Ex. A, Agreement, p. 1; Ex. L.)

**Risk of Investment**

36.     On January 15, 2009, prior to execution of the Contingent Purchase Agreement, CaseFunding wrote to lead counsel in the underlying Class Action to confirm various aspects of the funding arrangements between CaseFunding and Defendants.  (Ex. D, pp. 3-4.)  The January 15 letter stated, in part (emphasis added):

> Finally, this will also confirm that, based upon our conversations, even though there are judgments in these cases, those judgments are on appeal and the appellate courts may overturn the judgments, reduce the awards, or refer the cases back to the trial court.  Therefore, you have indicated that there is no absolute recovery guaranteed in these cases.

37.     Class Counsel responded to CaseFunding's letter on February 7, 2009 (Ex. D, p. 1):

> I don't disagree with your analysis and as you know we wish the clients could simply wait for the outcome of the case.  This will also confirm my agreement that your email of January 15th accurately represents our discussions and understanding.  Deborah LaBelle

38.     On July 6, 2009, *after* execution of the Contingent Purchase Agreement, class counsel, Ms. LaBelle, wrote a letter to Defendant Flemion and other members of the plaintiff class to advise  them of a June 30, 2009 tentative settlement of the Class Action and to recommend that the class members, including Ms. Flemion, accept the settlement.  (Ex. E.)

39.     Ms. LaBelle's July 6, 2009 letter to Defendant Flemion informed the class members: "With regard to the first group of women who went to trial last year, there continues to be a substantial risk of loss."  (*Id.*, p. 2, emphasis added.) (Defendant Flemion is among the women to whom Ms. LaBelle was referring.)

x

00698303.DOCX

40.     Ms. LaBelle went on to state that the Michigan Supreme Court "could dismiss the case and the verdicts will be lost in their entirety or it could reverse and order a new trial." (*Id.*)  She stated that there continued to be a "risk of losing everything."  (*Id.*)

## Introduction

The reasoning and authority set forth in the R&R and Summary Judgment Order are equally applicable here because the arguments presented by CaseFunding in its Motion for Summary Judgment as to the other Defendants are the same as those at issue in this motion. The Contingent Purchase Agreements at issue are materially identical. *(Compare* Ex. A here to Exs A-H of DE 188). It is undisputed that there are no issues of fact or law that distinguish the claims against Defendant Flemion. As such, the Court should grant summary judgment in favor of CaseFunding.

The R&R adopted by the Court correctly concluded that (i) New York law should apply in this case based on the choice of law provision in the Agreements at issue, and thus CaseFunding was entitled to summary judgment; (ii) even if there were no choice of law provision, New York should apply under Michigan choice of law principles, and thus CaseFunding was entitled to summary judgment; and (iii) even if Michigan law were to apply, the Court should grant CaseFunding's motion because Defendants' obligation to pay under the Agreements was contingent on uncertain recovery, and thus the Agreements do not involve the charging of interest and Michigan's usury law is not applicable. The Court should reach the same conclusions as to Defendant Flemion.

## Legal Standard

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). In *Fed. Home Loan Mortg v. Hulet*, 2006

1

U.S. Dist. LEXIS 933, *7 (2006) (Ex. F), this Court emphasized that "[t]o create a genuine issue of material fact, the nonmovant must do more than present some evidence on a disputed issue. . . . If the [nonmovant's] evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* (quoting *Liberty Lobby Inc.,* 477 U.S. at 249-250). "[T]he evidence must be more than the non-movant's own pleadings and affidavits," and "the mere existence of a scintilla of evidence in support of the non-movant is not sufficient; there must be sufficient evidence upon which a jury could reasonably find for the non-movant." *Id.* at *10 (citations omitted).

## Argument

There are no genuine issues of disputed fact in this case. Defendant Flemion cannot dispute that she executed the Contingent Purchase Agreement or that she received money from CaseFunding. The terms of the Agreement are clear and cannot reasonably be disputed. The only disputed issue in this case is whether the Contingent Purchase Agreement is an enforceable contract. It is. CaseFunding is entitled to summary judgment. The Court should enter a Judgment against Defendant Flemion in the amount requested, which is per the terms of the Agreement.

As stated in the Agreement and supported by other facts, CaseFunding provided funds to Defendant Flemion (or on her behalf) in exchange for a <u>contingent</u> interest in <u>potential</u> proceeds from the Class Action. (Ex. A, Agreement, p. 2, ¶ 3.) If Defendant Flemion had recovered nothing through the Class Action, CaseFunding would have been entitled to nothing under the Agreement. (*Id.*) If Defendant Flemion had recovered less through the Class Action than the amount owed under the Agreement, CaseFunding would have no claims against her for additional amounts. (*Id.*)

2

The Contingent Purchase Agreement does not evidence a loan from CaseFunding to Defendant Flemion. The funds provided by CaseFunding were investments, not loans, because there was no guarantee of recovery. *Blackwell Ford, Inc. v. Calhoun*, 219 Mich. App. 203, 209; 555 N.W.2d 856 (1996) ("The hallmark of a loan is the *absolute* right to repayment.") (emphasis in original). Both the R&R and the Summary Judgment Order conclude that CaseFunding's Agreements do not evidence loans, do not charge interest and thus are not usurious. (Ex. J, pp. 23-27; Ex. K, pp. 7-9.) There is no reason to reach a different conclusion here.

**1.      Defendant Flemion's anticipated "usurious loan" argument has no merit.**

Defendant Flemion will undoubtedly argue that CaseFunding's purchase of potential proceeds from the Class Action was actually a usurious loan and, thus, unenforceable. Such an argument has no merit, as Magistrate Komives concluded in his R&R and the Court recognized in its Summary Judgment Order. The argument rests on a claim that even though Defendant Flemion indisputably had not recovered any funds when she signed the Agreement and took CaseFunding's money, she was certain to recover in the Class Action and, thus, CaseFunding's rights under the Agreement were not truly contingent. That claim is at odds with the facts.

It is a matter of public record that the Michigan Department of Corrections was engaged in the appeals process regarding the judgments in favor of Defendants in the Class Action. It is also undisputed that prior to providing any funding to Defendants, CaseFunding confirmed with lead counsel in the Class Action, Deborah LaBelle, that Defendants had no absolute right to recovery. On January 15, 2009, CaseFunding wrote to Ms. LaBelle to confirm various aspects of the funding arrangements between CaseFunding and Defendant. (Ex. D, pp. 3-4.) The January 15 letter stated, in part (emphasis added):

> Finally, this will also confirm that, based upon our conversations, <u>even though there are judgments in these cases, those judgments are on appeal and the appellate courts may overturn the judgments, reduce the awards, or refer the</u>

3

> cases back to the trial court. Therefore, <u>you have indicated that there is no absolute recovery guaranteed in these cases</u>.

Ms. LaBelle responded to CaseFunding's letter on February 7, 2009 (*Id.*, p. 1):

> I don't disagree with your analysis and as you know we wish the clients could simply wait for the outcome of the case. <u>This will also confirm my agreement that your email of January 15th accurately represents our discussions and understanding</u>. Deborah LaBelle

Defendant Flemion had no absolute right to recovery prior to CaseFunding's first investment in her claims on February 9, 2009. She continued to have no absolute right to recovery after the last of CaseFunding's three investments with Flemion on June 26, 2009. On July 6, 2009, Ms. LaBelle wrote a letter to Defendant Flemion and the other members of the plaintiff class to advise them of a June 30, 2009, tentative settlement of the Class Action and to recommend that the class members accept the settlement. (Ex. E.) The July 6, 2009 letter informed Flemion: "With regard to the first group of women who went to trial last year, <u>there continues to be a substantial risk of loss</u>." (*Id.*, p. 2, emphasis added.) It is undisputed that Defendant Flemion is among the women to who went to trial in 2008. Ms. LaBelle went on to state that the Michigan Supreme Court "could dismiss the case and the verdicts will be lost in their entirety or it could reverse and order a new trial." (*Id.*) She stated that there continued to be a "<u>risk of losing everything</u>." (*Id.*, emphasis added.)

The funds provided by CaseFunding to Flemion were investments in which CaseFunding's principal was legitimately at risk. They were not loans because there was no guarantee of recovery. *Blackwell Ford*, 219 Mich. App. at 209 ("The hallmark of a loan is the *absolute* right to repayment.") (emphasis in original). Because the funds provided to Flemion were not loans, they are not subject to usury law. Put differently, because the Contingent Purchase Agreement does not earn *interest*, but rather, has a *contingent* a *rate of return*, usury statutes do not apply. *See, e.g. Black v. Contract Purchase Corp.*, 327 Mich. 636, 643; 42

4

N.W.2d 768 (1950) (stating that usury statutes are applicable only to *interest* rates and accordingly rates of discount are not usurious "no matter how high the discount nor how low the price paid.")

Well settled law clearly provides that usury laws do not apply to agreements whereby the return of the *principal is put at risk,* i.e. contingent agreements.  *See, e.g.,* the United States Supreme Court's decision in *Conard v. Atlantic Ins. Co.*, 26 U.S. 386 (U.S. 1828), where the Court found "it has been settled with the most harmonious consent, that *if* the principal and interest of the loan be at hazard upon a ***real contingency, it is not a case for the imputation of usury*** . . . Such cases are not contracts of loan, but of insurance on hazard. They are placed by the civil law in the class of aleatory contracts.  They . . . **cannot be usurious**."  *Id.* (internal citations omitted) (emphasis added); *see also Stevenson v. Unkefer*, 14 Ill. 103 (Ill. 1852) stating "[w]hen a payee *takes a risk* by which he runs the hazard of losing the principal sum, or of receiving less than the sum originally due, with lawful interest, *it is not usurious for him to stipulate for, or receive more interest than is prescribed by statute*." *Id.* (emphasis added) Similarly, here CaseFunding's profit/loss was contingent upon the recovery, if any, from the Class Action, and thus the funding is not subject to usury law.

Regardless of the terminology used in the agreement, courts consider the nature of the transaction to determine if usury laws are applicable.  *See, e.g., Lawsuit Financial, L.L.C. v. Curry*, 261 Mich. 579; 246 N.W.2d 504 (2004). Where there is an absolute right of repayment, the contract will be subject to usury laws.  *Id.*  Where there is a true contingency, the contract cannot be usurious.  *Conard, supra.*  Here, Flemion's duty to repay funds to Plaintiff was wholly contingent upon the recovery, if any, in the Class Action, and as such the Agreement cannot be usurious.

5

2.     **New York law applies to the Agreement.**

The Contingent Purchase Agreement clearly states that New York law governs "the validity, interpretation and enforceability" of the Agreement. (Ex. A, ¶ 22.) There is no reason for this Court not to honor the parties' choice-of-law provision, just as it did in the Summary Judgment Order (Ex. K, pp. 3-5).

When sitting in diversity, federal courts must apply the conflict of law rules of the forum state. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487 (1941). Here, Michigan's choice-of-law rules must be applied by this Court. It is undisputed that Michigan's public policy favors the enforcement of choice-of-law provisions. *Turcheck v. Amerifund Fin., Inc.*, 272 Mich. App. 341, 345; 725 N.W.2d 684 (2006). In fact, Michigan's choice-of-law rules provide that a contract's choice of law provision must be enforced unless certain criteria are present. *Kipin Indus., Inc. v. Van Deilen Int'l, Inc.*, 182 F.3d 490, 493 (6th Cir. 1999); *Hudson v. Mathers*, 283 Mich. App. 91, 96-97, 770 N.W.2d 883 (2009). A court may decline to enforce a contract's choice-of-law provision only if (1) the chosen state has no substantial relationship to the parties or the transaction *or* (2) enforcement would violate a fundamental policy of the state which has a materially greater interest in the disputed issue and which would have governed in the absence of the parties' selection. *Hudson, supra; Kipin, supra.*

In this case, there is a substantial connection between the parties and the transaction and the State of New York. CaseFunding's principal place of business is located at 32 West 39th Street, 12th Floor, New York, New York. (Ex. A p.1; DE 1, ¶ 2.) CaseFunding sent the Contingent Purchase Agreement from New York to Flemion. (Ex. A, p. 1.) CaseFunding provided over $150,000 from New York to the Defendant Flemion in this case. The Agreement contemplates that Defendant Flemion would send proceeds owed to CaseFunding under the Agreement to its New York office. (Ex. A, ¶ 19.) CaseFunding has suffered its injury in New

6

York, where its offices are located. The state law chosen by the parties (New York) does not have an attenuated connection this transaction; it is the law of the state of domicile of one of the parties to each Agreement and it the law of the state where the only performance under the Agreements (CaseFunding's performance) has occurred. The Sixth Circuit has held that "it is clear under the Restatement that a party's place of domicile is sufficient to meet the substantial relationship test of § 187(2)(a)." *Kipin Indus., Inc. v. Van Deilen Int'l, Inc.,* 182 F.3d 490, 494 (6th Cir. 1999) (internal citations omitted). Here, there is domicile of a party and much more.

The only other basis for this Court to disregard the Purchase Agreement's choice-of-law provision is if this Court finds that (1) Michigan has a materially greater interest than New York in the determination of the issues <u>and</u> (2) application of New York's law would be contrary to a fundamental policy of Michigan. *Hudson, supra.*

In *Milne v. Accurcast Inc.*, 2010 U.S. Dist. LEXIS 5311, *15-17 (E.D. Mich. Jan. 25, 2010) (Ex. H), the Court found that Michigan did not have a materially greater interest in the outcome of the lawsuit as compared to the state chosen by the parties in their contract. The court stated that while it was true that the defendant contracted with a Michigan resident who performed the majority of his work from his office in Michigan, Defendant was located outside of Michigan, the decision to terminate the agreement was made outside of Michigan, all of the orders were received and fulfilled outside of Michigan and payment for the orders was directed outside of Michigan. *Id.*

Here, like in *Milne,* Michigan does not have a materially greater interest in the outcome of this lawsuit as compared to New York. While it is true that Defendant Flemion is a Michigan resident, it is also true that (1) CaseFunding is located in New York; (2) repayment of the investments was to be directed to New York; (3) the decision to declare a default on the Agreement was made in New York; (4) requests for funding were received and processed in

7

New York; (5) funding was provided from New York and (6) CaseFunding's injury was felt in New York. Accordingly, like *Milne,* this Court should find that Michigan does not have a materially greater interest in the determination of the issues presented in this case than New York. The Court should thus enforce the choice of law provisions in the Contingent Purchase Agreement and apply New York law to assess the enforceability of the terms of the Agreement.

**3.     Michigan Does Not Have a Materially Greater Interest.**

Defendant Flemion's anticipated argument that Michigan has a materially greater interest in determining whether the Agreements at issue are usurious essentially boils down to "Michigan's usury law is important, therefore Michigan has a materially greater interest." The Court has rejected that argument in its Summary Judgment Order (Ex. K, p. 7):

> However, because the Court agrees with the Magistrate Judge that Michigan does not have a materially greater interest in the usury issue than does New York, for the reasons set forth in the R&R, there is no need to engage in § 188 analysis and decide between the Magistrate Judge's conclusion on the one hand (that the balance of factors favor New York law) and Defendants' contention on the other (that the balance of factors favor Michigan law).

CaseFunding anticipates that, like the other Defendants, Flemion will attempt to create a great difference between Michigan and New York usury law and then use that exaggerated distinction to try to convince the Court that Michigan law must be applied here. As the R&R recognized, however, the permissible rate of interest is actually lower under New York's usury statute than under Michigan's (6% versus 7%) and New York usury law provides other protections that Michigan law does not. (Ex. J, p. 14, n. 7). As the Court stated in the Summary Judgment Order (Ex. K, p. 4):

> The Court concludes that, although Michigan and New York differ in certain applications of the prohibition on usury, the laws are not so different that application of New York law would violate Michigan's fundamental public policy, nor do the two states' laws stem from fundamentally different policy interests.

8

New York law, like the law of most states, provides that usury only applies to loans:

Rate of interest; usury forbidden

1. The rate of interest, as computed pursuant to this title, <u>upon the loan or forbearance</u> of any money, goods, or things in action, except as provided in subdivisions five and six of this section or as otherwise provided by law, shall be six per centum per annum unless a different rate is prescribed in section fourteen-a of the banking law.

2. No person or corporation shall, directly or indirectly, charge, take or receive any money, goods or things in action as interest <u>on the loan or forbearance</u> of any money, goods or things in action at a rate exceeding the rate above prescribed.

NY CLS Gen. Oblig. § 5-501 (2011) (Ex. I.) "Usury laws apply only to loans or forbearances, <u>not investments</u>." *Seidel v 18 E. 17th St. Owners*, 79 N.Y.2d 735, 744; 586 N.Y.S.2d 240 (1992) (citing NY CLS Gen. Oblig. Law § 5-501[1], [2]) (emphasis added). "If the transaction is not a loan, there can be no usury, however unconscionable the contract may be." *Id.* (internal citations omitted.) "The existence of a loan or forbearance of money is the rudimentary element of usury." *Fried v. Bolanos*, 187 A.D.2d 108, 110; 592 N.Y.S.2d 144 (1993).

In *Donatelli v Siskind*, 170 A.D.2d 433; 565 N.Y.S.2d 224 (1991), the parties entered into an agreement whereby the defendant was then required pay certain amounts at an interest rate of 18% per annum (a rate in excess of the usury rate of interest) in the event he did not pay certain monies upon demand. The court, citing the rule that there can be no usury in the absence of a loan or forbearance of money, held that New York's usury statutes do not apply to a joint venture agreement entered into for the purpose of making a profit. *Id.* The court found that such agreements are not usurious but are rather valid and enforceable. *Id.* "In order for a transaction to constitute a loan, there must be a borrower and a lender; and it must appear that the real purpose of the transaction was, on the one side, to lend money at usurious interest reserved in

some form by the contract and, on the other side, to borrow upon the usurious terms dictated by the lender." 565 N.Y.S.2d at 226.

Because the funds provided under the Contingent Purchase Agreement were investments, and not loans, New York usury analysis simply does not apply in this case.

**4.     Even if Michigan Law Applied, the Agreement Is Not Usurious.**

Even if Michigan law applied in this case, the decision in *Lawsuit Financial, L.L.C. v. Curry*, 261 Mich. 579; 246 N.W.2d 504 (2004), which CaseFunding assumes Defendant Flemion will cite, is of no help to Defendant Flemion.  In the underlying personal injury litigation in that case, the defendants had already <u>admitted</u> liability and the jury had already returned a verdict of $27 million in damages at the time the funding company entered into its agreements with the plaintiff.  *Id*. at 587-88.  The court found that, under those circumstances, Lawsuit Financial had an absolute right to recovery and, thus, that the transactions were usurious loans.  *Id*.

In contrast, when CaseFunding provided funds to Defendant Flemion, the defendants in the Class Action had not admitted liability and were appealing the judgments.  As class counsel confirmed to CaseFunding before it funded under the Agreement and cautioned the class members after Flemion received CaseFunding's money, there was "no absolute guarantee of recovery in these cases," there was a "substantial risk of loss," the appellate courts "could dismiss the case and the verdicts will be lost in their entirety" and there was a real "risk of losing everything." (Ex. D, pp. 1, 3-4; E, p. 2.)  No facts like those on which the *Lawsuit Financial* court based its decision are present here.

CaseFunding anticipates that Defendant Flemion will rely on Order by the Macomb County Circuit Court in *Vinch, et al. v. Lawsuit Financing, Inc., et al*., No. 2004-3963 (Mich. Cir. Ct. Feb. 28, 2005.  (Ex. M.)  Such reliance would be misplaced not only because *Vinch* is readily distinguishable, but also because the ultimate result in *Vinch* <u>supports</u> granting summary

10

judgment in favor of *CaseFunding*.  In *Vinch*, Judge Servitto ruled that since the choice of law provision in the contract at issue called for the application of law of a state that has no usury laws and thus no protection against usury, application of the law of that state would violate a fundamental policy of Michigan.  (*Id.*, p. 5.)  In contrast, New York has a usury statute that "in many respects New York law is more protective of borrowers than Michigan law."[1]  (R&R, p. 14, n. 7.)  Moreover, the *Vinch* court in a later Opinion and Order granted summary disposition to the funding company finding that Michigan's usury statute did not apply because the agreement at issue, which was materially the same as the Agreements at issue here, was a "contingency agreement and not a loan" because recovery was uncertain when the funds were provided.  (Ex. N.)  The *Vinch* court distinguished the *Lawsuit Financial v. Curry* decision in exactly the same way that both CaseFunding and the Recommendation distinguish that *Curry*. (*Id.*, pp. 3-5.)

Likewise, Defendants' anticipated reliance on *Kaneff v Delaware Title Loans Inc*, 587 F.3d 616 (3rd Cir 2009), is misplaced. The court's rationale in *Kaneff* for disregarding the contract's choice of law provision has no application in this case.  In *Kaneff*, like *Vinch*, the court ruled that since the choice of law provision in the contract at issue called for the application of law of a state that has no usury laws and thus no protection against usury, application of the law of that state would violate a fundamental policy of the forum state, Pennsylvania. *Id.* at 622-24. Here, CaseFunding provided funds on an admittedly contingent basis under New York law, which arguably has a more protective usury statute than Michigan.  In contrast, *Kaneff* involved a secured, non-contingent loan under the laws of a state with no usury protection.  The Court's Summary Judgment Order concludes that *Kaneff* is distinguishable.  (Ex. K, p. 6.)

_____

11

The North Carolina Court of Appeals' case *Odell v. Legal Bucks, LLC*, 665 S.E.2d 767 (N.C. Ct. App. 2008), finding that contingent advances are subject to that state's usury laws is distinguishable for numerous reasons:  (1) *Odell* was not decided under Michigan law; (2) the ruling is contrary to the reasoning of the Michigan Supreme Court in *Lawsuit Financial* regarding the importance of whether funding is contingent; (3) the ruling is inconsistent with the result in *Vinch* and the authority cited in CaseFunding's briefs and the Recommendation; and (4) the ruling is contrary to the U.S. Supreme Court's longstanding rule that "it has been settled with the most harmonious consent, that *if* the principal and interest of the loan be at hazard ***upon a real contingency, it is not a case for the imputation of usury*** . . . ***Such cases are not contracts of loan***, but of insurance on hazard. They are placed by the civil law in the class of aleatory contracts.  They . . . ***cannot be usurious***."  The Summary Judgment Order also concludes that *Odell* is distinguishable.  (Ex. K, p. 8.)

5.      **Possible Consumer Protection Act arguments are without merit.**

Flemion may also argue that the Contingent Purchase Agreement violates the Michigan Consumer Protection Act, MCL § 445.901 et seq. ("MCPA").  As the Court recognized in its March 16, 2011 Order (Ex. G, p. 5, n. 2), this argument has no merit.  Even if the MCPA applied to the transactions at issue in this case, which CaseFunding does not concede, CaseFunding has violated the MCPA.

a.      **The Contingent Purchase Agreement does not violate MCL § 445.903(z).**

MCL § 445.903(z) prohibits: "Charging the consumer a price that is grossly in excess of the price at which similar property or services are sold."  This prohibition inherently applies to situations where the same (or very similar) product is sold to one consumer at one price and to another consumer at a much higher price without justification.  This subsection of the MCPA simply has no application to the investments at issue by CaseFunding (or other companies), in

12

which many factors enter into the Agreement's terms, including the amount of risk involved, the
potential size of the recovery and CaseFunding's (or other companies') required or desired rate
of return at different points in time.

**b. The Contingent Purchase Agreement does not violate the MCPA's disclosure provisions or provisions against taking advantage of consumers who cannot understand the transaction at issue.**

As the Court can see from the Contingent Purchase Agreement, it is difficult to imagine
how much clearer CaseFunding could have been in disclosing <u>all</u> terms of the Agreement. The
Agreement identifies in <u>five separate places</u> all of the following: the purchase price, the exact
amount of fees being charged and the contingent monthly rate of return. (Ex. A, Consumer
Disclosure Statement, pp. 1 & 2, Agreement, pp. 1, 2, & 9.) The Agreement identifies in <u>four
separate places</u> the contingent annual rate of return and CaseFunding's contingent share of the
proceeds by month depending on the date of recovery. (Ex. A, Consumer Disclosure Statement,
p. 2, Agreement, pp. 1, 2, & 9.) Among many other disclosures acknowledged and agreed to by
Flemion, the Agreement provides:

> Seller has been advised and understands that the cost of selling a portion of
> the Proceeds to Purchaser is potentially expensive and should only be used as
> a last resort and that Purchaser may make a substantial profit from its
> investment by the terms of this Agreement. Other sources of funding,
> including loans, may be available at more favorable rates, payment schedules,
> terms and conditions.

> Seller has had a full and complete opportunity to consult with an attorney and
> other advisors before signing this Agreement. This Agreement has been fully
> explained to Seller, and all questions that Seller might have about this
> transaction have been fully explained. In no event shall the fee agreement
> between the Seller and the Attorney be changed in any way that could reduce
> the amount of the Proceeds payable to Purchaser under this Agreement.

> Seller may rescind this Agreement within 5 business days following the
> Seller's receipt of funds from Purchaser, provided, however, that Seller must
> provide written notice of rescission and return the Purchase Price to Purchaser
> simultaneously with the rescission. . . . .

13

(*Id.*, p. 7, ¶¶ 24-26.)

Defendant Flemion also signed a Consumer Disclosure Statement acknowledging again that she had been advised about all of the terms of the Agreement and understood them, including the following:

> You have been advised and understand that the cost of selling a portion of the Proceeds to Purchaser is potentially expensive and should only be used as a last resort and that Purchaser may make a substantial profit from its investment by the terms of the Agreement. Other sources of funding, including loans, may be available at more favorable rates, payment schedules, terms and conditions. You recognize that the Purchase Price is at risk and that Purchaser may lose its entire investment if there is no recovery with respect to the Claim.

(Ex. A, Consumer Disclosure Statement, p. 1.)  Her attorney also signed an Attorney Acknowledgement attesting to understanding the terms of the Agreement and stating:

> I affirm, under penalty of perjury, that <u>I have reviewed and explained the contract to Seller</u>, including the annualized rate and the monthly rate, compounded monthly, applied to calculate the Purchaser's Share of the Proceeds with respect to the Claim.

 (Ex. A at Ex. C.)

CaseFunding did not take advantage of Defendant Flemion.  Instead, it is Defendant Flemion who is now trying to take advantage of CaseFunding by arguing that CaseFunding is not entitled to the agreed upon return on its investment.

14

## Conclusion

For all of the foregoing reasons, CaseFunding requests that the Court enter an Order granting summary judgment to CaseFunding under Fed. R. Civ. P. 56 on its breach of contract claims against Defendant Carrie Flemion.


Respectfully submitted,

WILLIAMS, WILLIAMS, RATTNER & PLUNKETT, P.C.


/s/ David E. Plunkett
David E. Plunkett (P66696)
Susan A. Babcock (P71946)
Attorneys for Plaintiffs
380 N. Old Woodward Ave., Suite 300
Birmingham, MI  48009
(248) 642-0333
dep@wwrplaw.com
sab@wwrplaw.com

Dated:  May 10, 2012

15

00698303.DOCX

## CERTIFICATE OF SERVICE

I hereby certify that on May 10, 2012, I caused the foregoing Plaintiffs' Motion for Summary Judgment as to Defendant Carrie Flemion and Brief in Support together with Index of Exhibits and Exhibits to be filed with the Court using the ECF system, which will provide notice to all counsel of record.

/s/ David E. Plunkett_____
David E. Plunkett